UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY C. JOHNSON,

    Plaintiff,

    v.

NANCY A. BERRYHILL[1],

    Defendant.

Case No. 16-cv-01332-JCS

**ORDER RE MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 16, 18

## I.    INTRODUCTION

Plaintiff Anthony C. Johnson seeks review of the final decision of Defendant Nancy A. Berryhill, Commissioner of the Social Security Administration (the "Commissioner") adopting the June 19, 2014 decision of an Administrative Law Judge ("ALJ") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* Presently before the Court are the parties' cross-motions for summary judgment. For the reasons stated below, the Court GRANTS Johnson's Motion for Summary Judgment ("Johnson Motion"), DENIES the Commissioner's Motion for Summary Judgment ("SSA Motion") and REMANDS the case to the Commissioner for further administrative proceedings.[2]

---

[1] Nancy Berryhill became the Acting Commissioner of Social Security on January 23, 2017, and is therefore substituted for Carolyn W. Colvin as the Defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[2] The parties have consented to jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

## II. BACKGROUND

### A. Procedural History[3]

On September 30, 2011, Johnson applied for SSI benefits, alleging disability based on chronic back pain, knee pain, a stroke-related heart condition, depression, and anxiety. Administrative Record ("AR") at 288, 422. While Johnson initially alleged a January 1, 2003 onset date, he subsequently amended his claim to allege an onset date of September 30, 2011. AR at 422. The Social Security Administration denied Johnson's claim on April 4, 2012, and affirmed the denial on reconsideration on November 16, 2012. AR 22, 167-72, 176-181. On January 8, 2013, Johnson filed a written request for an administrative hearing to reconsider these denials. AR 22, 182-84.

On November 25, 2013, ALJ Richard P. Laverdure held an administrative hearing. AR 65-72. No testimony was taken at that hearing, however, because Johnson's previous counsel had withdrawn and he was in the process of obtaining new counsel. *Id*. Therefore, the ALJ continued the hearing to March 6, 2014. AR 73. On March 6, 2014, Johnson appeared with his new counsel, Brian Hogan, and the ALJ took testimony from Johnson and a vocational expert, Mary Ciddio. AR at 73-120.

On June 19, 2014, the ALJ issued a decision finding Johnson was not disabled. AR 19-38. On August 22, 2014, Johnson requested review of the ALJ's decision by the Social Security Appeals Council. AR at 18. On January 14, 2016, the Appeals Council denied Johnson's request for review of the ALJ's decision, making the ALJ's decision the final decision of the

---

[3] On July 18, 2006, Johnson submitted a prior supplemental security income (SSI) application, alleging a disability onset date of October 5, 2005. That application was denied initially and on reconsideration, and after a hearing by the same ALJ became the final decision of the Commissioner. Plaintiff did not appeal that decision. In addressing the claim that is the subject of the present action, the ALJ concluded that any presumption that might have arisen as a result of the prior finding of non-disability had been rebutted because there were changed circumstances, namely, worsening of residual functional capacity and additional severe impairments. AR 22-23. As neither party challenges that conclusion, the Court does not revisit that question here. Consequently, the Court need not address the Commissioner's prior finding of nondisability in this Order.

United States District Court
Northern District of California

Commissioner.  AR at 1-4.

On March 17, 2016, Johnson filed this action, seeking the Court's review of the Commissioner's final decision.  The parties now move for summary judgment.

**B.  Factual Background**

**1.  Personal and Vocational History**

Johnson was born on January 30, 1967 and raised in Richmond, California with four siblings and his mother.  AR at 44, 619.  Johnson testified at the March 6, 2014 hearing that he dropped out of high school after completing eleventh grade.  *Id.* at 106-07, 620.  Subsequently, in the 1990s, Johnson attempted to obtain his General Education Diploma ("GED"), but failed the test.  *Id.* at 107, 621.  During and shortly after leaving high school, Johnson received a total of 18 months of training to be an auto mechanic, eventually completing his training and obtaining certification as an auto technician.  *Id.* at 44-45.

According to Johnson, during or around 1989[4], he sustained a "serious gunshot wound to the back."  *Id.* at 46, 621.  Following this injury, Johnson "was unable to walk and underwent a lengthy rehabilitation," but doctors were "unable to remove bullet fragments from his spine, resulting in chronic pain in his back and legs that has worsened over time."  *Id.* at 621.

Between the time he left high school and 2003, when he stopped working, Johnson worked as a sports director at a community center in 1995, as a full-time forklift operator for about a year in 2000 or 2001, and as an auto mechanic.  *Id.* at 45, 54, 104.  In 2003, Johnson had to quit his job as a full-time auto mechanic for Midas Mufflers because his back went out due to residual shotgun pellets in his lower back.  *Id.* at 45-46.

After 2003, Johnson attempted to return to work on three occasions.  *Id.* at 88-89.  First, in 2009, Johnson tried to work for a friend who owned a body shop but "couldn't do it."  *Id.* at 88.  Second, in 2010, Johnson attempted to help a friend who owned a body shop during a two to three week stint working as an auto mechanic, but these efforts ended when Johnson's back and legs

_____

[4] While Johnson describes getting shot in 1989 at the November 2008 administrative hearing on his prior disability claim, and "in the late 1980s or early 1990s" to Dr. Kalich, another doctor, Dr. Bayne, stated in an orthopedic evaluation that Johnson "sustained a gunshot wound to his back in 1995."  *See* AR at 46, 541, 621.

3

gave out when a car transmission fell on him. *Id.* at 87. Third, in 2013 Johnson attempted to work as an auto mechanic for a friend because his lawyer had told him that his doctor said he could go back to work, but he stopped working after two days when he began experiencing back pain. *Id.* at 89. Johnson's friend told him that he could not return to work without a doctor's note due to Johnson's complaints of intense back pain and Johnson did not resume that work. *Id.* at 89.

## 2. Medical History

### a. X-Rays and CT Scans

On March 8, 2010, Johnson obtained an x-ray of his lumbar spine region, which revealed a "buckshot wound to the lower lumbar spine centered on L4 and to a lesser extent L3, but spreading above and below this level." AR at 484. Dr. Frederick M. Foley noted in his analysis that "[p]rimarily, the pellets are located in the posterior soft tissues, but some are embedded in the posterior processes of L3 through L5 and a few are located more anteriorly, some clearly in the soft tissues and others perhaps embedded in bone." *Id.* Dr. Foley summarized his impression of the x-rays as indicative of "[b]uckshot pellets to the lower lumbar spine as described, with associated degenerative disc disease L3-4 and L4-5." *Id.* Johnson also obtained a CT scan on July 21, 2010 that corroborated the presence of "innumerable small, 3.7 mm in diameter rounded pieces of metal secondary to buckshot in [Johnson's] posterior lumbar spine region." *Id.* at 485. In analyzing the CT scan results, Dr. L. Evan Custer stated there was a "[p]robable post laminectomy, L4 level," as well as a "[n]arrowing of the L4-5 and to a lesser extent, L5-S1 disc spaces," but noted that "evaluation of the spinal canal at the level of L4 is impossible because of the beam hardening artifacts." *Id.*

On April 25, 2011, Johnson obtained x-rays of his right knee. *See id.* at 487. Dr. Custer evaluated the results, finding that "[n]o fracture or dislocation [was] present." *Id.* In summarizing his impressions, Dr. Custer noted "[m]inimal narrowing of the medial compartment of the right knee associated with small joint effusion." *Id.* Dr. Custer also found there to be a "bullet overlying the distal left femur" as well as a "bipartite patella." *Id.*[5] A follow-up CT scan of the

---

[5] It is unclear from the current record when this second gunshot wound occurred.

right knee on June 2, 2011 revealed the presence of moderate degenerative disease, a 3 millimeter depression possibly representative of a previous trauma, and "[s]mall suprapatellar joint effusion and prepatellar subcutaneous edema." *Id.* at 489. In analyzing the CT Scan, Dr. Aaron Hayashi also noted a subchondral cyst located inferiorly adjacent to the tibial spine as well as a "[m]ultipartite patella." *Id.*

### b. Relevant Medical Treatment Records

#### i. Emergency Room Visit

On May 30, 2010, Johnson went to the emergency room ("ER") complaining of back pain. *Id.* at 440-41. During that visit, Johnson reported that he usually controlled his chronic back pain with medication, but that he had been unable to pick up his Vicodin prescription because he was told it was not yet available. AR 440. Johnson reported that he had borrowed someone else's Norco (a pain medication) because he felt it was more effective than Vicodin but came to the ER because he was "unable to walk secondary to pain." *Id.* Johnson's wife at the time described Johnson's symptoms as getting worse over the last several weeks to months, coming to a head when Johnson "collapse[d] secondary to pain and she found him on the floor" shortly before this visit to the ER. *Id.* During this visit, Johnson expressed a desire to obtain physical therapy to increase his day-to-day functioning and help teach his daughters martial arts. *Id.* Johnson reported that he was able to "walk and generally function in the community at baseline," but that he did not feel like he could continue to work and he was upset by his doctors telling him that he should be able to go back to work. *Id.*

#### ii. Dr. Hinman

From 2010 until mid-2014, Dr. Priscilla Hinman, of Contra Costa County Health Services' Richmond Health Center, was Johnson's primary care physician and treating doctor, having met with him on at least 14 occasions between June 2010 and May 2014 to evaluate and treat Johnson's various physical and mental impairments, including chronic back pain. *See id.* at 528–34, 538, 560–65, 592–609, 648–59. During the course of Dr. Hinman's treatment, she ordered x-rays and CT scans to be performed on Johnson, *id.* at 485, 487, 489, referred Johnson out for a functional capacity evaluation by the Contra Costa therapists, discussed in more detail below, *id.*

5

at 430-38, referred him to a psychiatrist (Dr. Shapiro) for evaluation and treatment of depression and possible PTSD, *id.* at 490, and prescribed a variety of medications.

In her notes from a June 23, 2010 examination, Dr. Hinman listed chronic lower back pain in her "assessment" and she noted that Johnson complained of back pain and hot flashes. *Id.* at 528. Her notes reflect that Johnson told her during that visit that his lower extremities were "not numb now" because he had taken Vicodin. *Id.* On September 2, 2010, Dr. Hinman again noted that Johnson exhibited symptoms of chronic lower back pain and depression, and continued to complain of hot flashes as well as poor sleep patterns. *Id.* at 529. Dr. Hinman wrote in her report of this visit that she had a "long discussion" with Johnson about depression, PTSD, and the potential for rehabilitation regarding alcohol abuse. *Id.* She also increased his Vicodin prescription. *Id.* On December 2, 2010, Dr. Hinman continued to note chronic pain; she increased the number of Vicodin tablets prescribed because Johnson had reported running out the previous month and she also prescribed Baclofen and Amtriptyline. *Id.* at 531.

On March 2, 2011, Johnson returned to Dr. Hinman's office to follow up on knee swelling that had lasted for three to four months; he also reported that his knees had locked up on him one to two weeks prior. *Id.* at 533. On March 11, 2011, Johnson was seen by a health care provider at Richmond Health Services. *Id.* at 532.[6] Johnson reportedly was seeking additional pain medication because he had run out of his prescribed medications. *Id.* He told the health care provider that he wanted to go to the hospital because of his back pain and because his legs were giving out. *Id.*

On April 21, 2011, Dr. Hinman referred Johnson to a "psychological liaison" "for the purpose of clarifying his diagnosis, clarifying whether meds would be of any assistance, and whether psychotherapy would be helpful." *Id.* at 490. In the referral, Dr. Hinman began by noting that Johnson "has chronic pain as the result of [gunshot wounds]," and is currently being treated with medication for his physical pain. *Id.* Dr. Hinman went on to describe the psychological

---

[6] The name of the provider is not listed on the notes and the signature is illegible. The signature line carries a notation "D/W/ Dr. Hinman," which the Court interprets as "discussed with Dr. Hinman." AR at 532.

symptoms she witnessed during her prior visits with Johnson, stating: "[h]aving seen the patient over several visits, it appears to me that he is fairly depressed and is fairly focused on his pain and feels victimized," going on to state that Johnson "probably has PTSD, and in general seems to have a pretty low quality of life." *Id.* Dr. Hinman states that in her appointments with Johnson, "[they] have talked about the impact that [Johnson's] depression and PTSD may be having on his chronic pain as well as the rest of his life" and that Johnson is "agreeable to a referral to a consult liaison." *Id.* As a result of this consultation request, Johnson obtained a psychological evaluation from Dr. Shapiro, discussed in more detail below, resulting in a prescription for Risperdal to treat Johnson's depression. *See id.* at 572–74.

Dr. Hinman examined Johnson again on July 21, 2011. *Id.* at 534. Johnson told her that he had fallen a few days earlier and hadn't gotten up because his back was hurting; he reported that he took pain medication and eventually got up. *Id.* Dr. Hinman listed chronic back pain and depression in the "assessment" section of her notes. *Id.* In her notes for an October 31, 2011 visit, Dr. Hinman wrote that Johnson was experiencing "more pain" especially at night and the back pain was of a "changed character." *Id.* at 538. She also noted that Johnson's Risperdal prescription was making him "more relaxed." *Id.*

At a February 29, 2012 visit with Dr. Hinman, Johnson reported that he was falling due to his legs giving out, that he was experiencing numbness and severe pain in his lower extremities, and that it "hurts too much to stand." *Id.* at 560. Dr. Hinman referred Johnson for physical therapy for a "TENS" unit (a transcutaneous electrical nerve stimulator) to address his pain. *Id.* On May 30, 2012, Johnson was seen again by Dr. Hinman. *Id.* at 562. The notes from the visit reflect that Johnson and Dr. Hinman discussed stress associated with a custody fight for two of children and his chronic pain. *Id.* Her "assessment" lists "mood [disorder]" and states that Johnson "seem[ed] ambivalent about counseling." *Id.*

On September 13, 2012, Dr. Hinman wrote up a progress report regarding Johnson's symptoms following a visit on August 29, 2012. *Id.* at 563-65. In relevant part, Dr. Hinman found that Johnson was still experiencing chronic back pain, that he had hypertension, and that he was continuing to exhibit a mood disorder. *Id.* at 563-64. Dr. Hinman noted that Johnson was

under a lot of stress due to a custody battle for two of his children. *Id.* at 563.  She also wrote that Johnson was "going to court, known to have anger issues, court wants him to get back on psych med. Risperidone helps him control anger/irritability, insomnia." *Id.*  Dr. Hinman prescribed Risperidone for Johnson for his depression in addition to renewing prescriptions for pain medication (amitriptyline and baclofen) and medication for his cholesterol. *Id.*

On February 27, 2013, Dr. Hinman saw Johnson for "muscle spasm on the leg and [b]ack with pain level of 8/10." *Id.* at 593.  Dr. Hinman wrote, "Chronic low back pain worse muscle spasm, nerves jumpy, 'possible' stress . . . ." *Id.*  Dr. Hinman noted that Johnson was "pleasant and engaged" during their encounter with "no apparent distress," but also assessed him as still suffering from hypertension, mood disorder, and chronic pain disorder. *Id.* at 594.  Dr. Hinman referred Johnson to a stress management group and arranged for a Health Coach Intern to follow up if he did not attend to schedule individual sessions.  *Id.*

On April 3, 2013, Johnson had another appointment with Dr. Hinman in which he complained of muscle spasms of the back and legs. *Id.* at 595.  Dr. Hinman noted that Johnson had been "having more pain for 2 days, muscle spasms in back and legs" and that baclofen "help[ed] briefly" but that he "sleeps poorly often, either due to pain or just not falling asleep." *Id*.  She also noted that he continued to have "lots of family issues" and that "ongoing stressors impact[ed] [Johnson's] mood." *Id.*

On May 1, 2013, Johnson saw Dr. Hinman for a follow up appointment, complaining of "increased back pain for 5 days," among other things. *Id.* at 598.  At a November 5, 2013 appointment, Johnson told Dr. Hinman that his back pain had increased. *Id.* at 608.  He told her he had tried to work for a friend in an automotive shop but had to stop after two days "due to pain." *Id*.  She also wrote, "[p]ain goes down both legs, excruciating with pins and needles, so can't stand up and walk sometimes." *Id.*

On January 7, 2014, Dr. Hinman saw Johnson again for back pain, among other things. AR at 649.  He told her that after he had stood up too fast, about two weeks before, his "mid lower back started hurting bad" and had been hurting ever since. *Id*.  He reported that he was taking six doses of hydrocodone (Vicodin) a day during this period instead of the four daily does prescribed

8

and asked for an "early refill." *Id.* Dr. Hinman noted that Johnson had never asked for an early refill before. *Id.* She had Johnson undergo drug screening in connection with a "new pain management contract." *Id.* Because the screening test came out negative, she agreed to refill Johnson's hydrocodone prescription early with "10 extra just for this month." *Id.* at 650. The "assessment" for this visit listed, among other things, "chronic pain disorder," "chronic back pain," and "[n]octurnal leg cramps." *Id.*

Notes from a visit to Dr. Hinman on May 5, 2014 reflect that Johnson had been having back pain for a month and that he had experienced "severe back pain" the previous month after a period of coughing. *Id.* at 652. He also told Dr. Hinman that he got "stressed out" and couldn't "deal with anyone" when his back hurt. *Id.*

### iii. Dr. Shapiro

On August 4, 2011, at the referral of Dr. Hinman, Richmond Health Center's Dr. Eileen Shapiro conducted a psychiatric examination of Johnson to address Dr. Hinman's concerns about his "irritability" and to "[r]ule out PTSD and depression secondary to chronic pain." *Id.* at 492. Dr. Shapiro noted that Johnson's "chief complaint" was that he was having a "lot of stress" and drinking more since his nephew was killed. *Id.* Dr. Shapiro noted that Johnson had a "long history of a volatile personality." *Id.* According to Dr. Shapiro, Johnson told her that he became "very angry and easily irritated when people [were] unable to remember directions he ha[d] given them," and that his irritability had increased since he began taking amitriptyline. *Id.* She noted, however, that since starting the amitriptyline Johnson's muscle spasms had gone away and he was sleeping through the night without having to take Trazodone. *Id.* Dr. Shapiro wrote that Johnson had "no plans of self-harm or harm to others." *Id.*

Dr. Shapiro's AXIS I diagnosis was as follows: "1. Mood disorder, not otherwise specified, rule out bipolar disorder, rule out substance-induced mood disorder (amitriptyline versus ETOH). 2. ETOH dependence in early sustained remission." *Id.* at 493. On AXIS II, Dr. Shapiro found that Johnson had antisocial traits. On AXIS V, she gave Johnson a global assessment of functioning ("GAF") of 60. *Id.* To help "stabilize mood and irritability that has increased since on the amitriptyline," and to counter its "induced irritability mania," Dr. Shapiro

prescribed Johnson a low dosage of Risperdal.  *Id.*

On September 6, 2011, Johnson had a follow-up appointment with Dr. Shapiro.  *Id.* at 535.
Johnson reported that he had been doing well over the past month on Risperdal.  *Id.*  Dr. Shapiro
described Johnson as "calm and cooperative" and noted that his mood was "good" and his affect
congruent.  *Id.*  Johnson told Dr. Shapiro that he had "been able to walk away rather than engage
in argument."  *Id.*  Dr. Shapiro continued Johnson's Risperdal.  *Id.*

Johnson saw Dr. Shapiro again on October 27, 201.  *Id.* at 536.  Dr. Shapiro's notes reflect
that Johnson's mood was "not good" and his affect was irritated.  *Id.*  Johnson told Dr. Shapiro
that he was having relationship issues and was seeing his own therapist.  *Id.*  He told her that he
was drinking alcohol and that he was having "inconsistent or demanding behaviors."  *Id.*  Dr.
Shapiro wrote that Johnson was having mood swings and irritability as a result of the
unpredictability of his relationship.  *Id.*  Dr. Shapiro increased Johnson's prescription of Risperdal.
*Id.*

Johnson saw Dr. Shapiro again on January 10, 2012.  *Id.* at 558–59.  At this appointment,
Dr. Shapiro noted that Johnson was doing "ok," but that he exhibited frustration during the
appointment while discussing his relationship issues.  *Id.* at 558.  Dr. Shapiro renewed Johnson's
Risperdal prescription and recommended a follow up appointment with Dr. Hinman.  *Id.* at 559.

### iv.  Additional Treatment Records

On August 5, 2011, Johnson received orthopedic services from Dr. David F. Osborne at
the Richmond Health Center.  *Id.* at 491.  In his notes of the visit Dr. Osborne stated that
Johnson's "right knee looks arthritic," he has no effusion, there is a mild varus deformity, and he
has "palpable medial osteophytes bilaterally."  *Id.*  Dr. Osborne also noted Johnson has a "full
range of motion."  *Id.*  Dr. Osborne recommended that Johnson "keep[] his legs strong" by cycling
or some other exercise.  *See id.*

On February 27, 2013, Johnson met with health coach Emma Hiatt regarding his ongoing
stressors, which included "relationship and child-custody issues."  *Id.* at 593.  During this visit, at
Ms. Hiatt's suggestion, Johnson agreed to attend group stress management sessions, exploring
individual sessions as needed.  *Id.*  Ms. Hiatt provided Johnson with a referral to the stress

10

management group and information on these sessions. *Id.* .

c. Consultative Medical Statements and Evaluations

i. Functional Capacity Evaluation

On November 1, 2010, at the referral of Johnson's treating physician, Dr. Hinman, Johnson was evaluated by Jeff R. Kaufman, OT/L, Mary Martin, DPT, and Karen Rodrigues, OT/L[7] of the Contra Costa Regional Medical Center (collectively, "Contra Costa therapists") to determine his residual functional capacity ("RFC"). *Id.* at 430-38. The "Summary" section of the report states that Johnson "demonstrated the ability to perform **all** of the simulation tasks," and completed the testing "in approximately three hours with rest periods consisting of sitting between each subtest." *Id.* at 430 (emphasis in original). It further states that the four activities and postures that "appeared to significantly increase patient's pain" were:

1. Lifting/Carrying loads weighing 20 lbs. or heavier.
2. Static Standing beyond approximately six minutes.
3. Pushing/Pulling dynamic loads weighing 75 lbs. or heavier.
4. Stair descent and ascent.

*Id.* It went on to state that "[m]uscoloskeletal evaluative tests indicated fair to excellent strength and limited range of motion with pain." *Id.* at 430. Johnson's maximum physical capacity for lifting was found to be "sedentary/light (15 pounds) with limited functional range" and for carrying was 15 pounds. *Id.* According to the report, Johnson's "report of pain was four through 6/10 initially with numbness and tingling and 7 through 9/10 with increased areas of numbness and tingling upon completion." *Id.* When testing Johnson's position tolerances, the Contra Costa therapists found that Johnson was able to crouch and stoop, but could only stoop half way because it was "very painful to low back." *Id.* at 432. Johnson was unable to kneel and did not attempt to squat due to low back pain. *Id.* With respect to his palpation, Johnson was tender around scarred tissue and the entire low back and left gluteal regions. *Id.* The Contra Costa therapists also noted that Johnson had "[v]ery limited tissue mobility at site of wound in lumbar spine." *Id.* The Contra

---

[7]Although the evaluators listed at the beginning of the report are Jeff R. Kaufman and Mary Martin, the signatures at the end of the report are those of Jeff R. Kaufman and Karen Rodrigues. AR at 430, 436. The reason for this discrepancy is not apparent from the record.

Costa therapists found that Johnson was within normal limits for active range of motion except for bilateral hamstring tightness, only 15 degree rotation for the right hip both internally and externally, and that they were unable to assess left hip due to lower back pain. *Id.*

During testing, Johnson had to take Vicodin due to increased low back pain and was "very irritable." *Id.* at 432. During his functional activities Johnson was able to sit for 30 minutes and stand for 6 minutes, but complained of pain at 7/10 after sitting and 8-9/10 after standing, forcing Johnson to discontinue the subtests. *Id.* at 435. While Johnson was able to push a 75-pound load on a 4-wheel cart, Johnson was "straining when pulling," and complained of 9/10 pain in the left sacrum after the test. *Id.* Finally, Johnson was able to ambulate 600 feet on level ground and four flights of stairs, but did so with "significant difficulty." *Id.* Johnson also displayed slow stair descent, antalgic gait on level ground, and significantly decreased stair ascent pace, complaining of pain ranging from 7 to 9 out of 10 while performing these activities. *Id.*

As instructed, Johnson called the evaluators on the telephone after the examination to report his post-test symptoms. AR 436. He reported that his pain was a 10/10 that evening, that he had difficulty walking after the testing, that he had to take Norco, Naproxen, and Percocet for the pain, and that he had difficulty sleeping that night and was "tossing and turning" in bed. *Id.*

### ii.  Dr. Bayne's Orthopedic Evaluation

On March 6, 2012, at the request of the SSA in conjunction with the current proceedings, Dr. Omar C. Bayne at the Bayview Medical Clinic conducted a consultative orthopedic examination to evaluate the scope of Johnson's physical limitations. *Id.* at 541-43. In his evaluation, Dr. Bayne described Johnson's history of chronic back pain stemming from shotgun pellets lodged in his back, noting that this "back pain is aggravated when he walks for more than a block, with bending, twisting, crouching or crawling." *Id.* at 541. Dr. Bayne stated that at the time of the examination, Johnson had been "conservatively" treated for his chronic back pain through physical therapy, pain medications, anti-inflammatory medications. *Id.* He noted that Johnson's back pain was aggravated when he walked for more than a block and that he used a cane when he walked more than two to three blocks. *Id.* Dr. Bayne also stated that Johnson complained of "chronic left knee pain" and been told that he had arthritis in his left knee. *Id.* Dr.

12

Bayne stated that Johnson had "problems climbing up and down stairs, squatting, crawling and stopping, as well as kneeling on his left knee." *Id.* With respect to both Johnson's back and knee pain, Dr. Bayne noted that Johnson's pain was alleviated "when he takes pain medications and anti-inflammatory medication and avoids aggravating factors." *Id.*

Dr. Bayne described Johnson as a healthy 45-year-old claimant who was well groomed, pleasant, and cooperative throughout the examination and appeared to be in no acute distress at the time of the examination. *Id.* With respect to his physical limitations, Dr. Bayne found that Johnson "was able to sit and get up from a sitting to standing position without difficulty," as well as walk on his heels and toes and squat 50 percent of normal. *Id.* at 542. Dr. Bayne also noted normal range of movement, muscle strength, and sensation in Johnson's neck and upper extremities. *Id.* For Johnson's back and lower extremities, Dr. Bayne found "significant lumbar muscle spasms bilaterally" as well as "palpable" pedal pulses, a limited range of movement in the back and left knee, and a full range of movement in [Johnson's] hips, right knee and both ankles." *Id.* Dr. Bayne also found that Johnson had normal muscle strength and sensations in all lower extremities, with the exception of "decreased sensation over the L5 dermatome in the lateral aspect of the left calf and dorsum of the left foot" and a tenderness to palpation in medial and patellofemoral compartments of his left knee. *Id.* at 542-543.

Dr. Bayne diagnosed Johnson with "[c]hronic recurrent back pain and spasms, status post shotgun wound blast to the low back with residual L4-L5 left radiculopathy," "[l]eft knee pain secondary to internal derangement" of his left knee, and possible arthritis in Johnson's left knee," and "history of depression . . . anxiety . . . [and] insomnia." *Id.* at 543. *Id.* In the "Functionality and Recommendations" section of the evaluation, Dr. Bayne found as follows:

> He has no gross visual, hearing, or speech impairment. He should be able to converse, communicate, understand, read and write in English. He should be able to drive or take public transportation. He should be able to stand and walk with appropriate breaks for four hours during an 8-hour workday. He should be able to sit with appropriate breaks for six hours during an 8-hour workday. Repetitive bending, twisting, crouching, crawling, stooping, kneeling, climbing up and down stairs, inclines, ramps or ladders should be limited to occasionally. He should be able to lift and carry 20 pounds frequently and 40 pounds occasionally. There are no restrictions in performing bilateral repetitive leg, ankle and foot

> control frequently. He should be able to perform bilateral repetitive finger, hand and wrist manipulations or bilateral repetitive hand tasks frequently. There are no restrictions in gripping, grasping, pushing and pulling or working with both hands above the shoulder level. He should be able to work in any work environment except on unprotected heights.

*Id.* In his evaluation, Dr. Bayne does not address what the term "appropriate breaks" means for Johnson. *See id.* Although the Administrative Record contains reports from multiple x-rays and CT scans of Johnson's back and knees, *see id.* at 483-489, Dr. Bayne did not review them, stating that "[t]here were no x-rays or MRI studies on this claimant for [him] to review."

### iii. Dr. Kalich's Psychological Evaluation

On February 26, 2014, on the referral of Johnson's prior counsel, Dr. Lisa Kalich completed a psychological evaluation of Johnson. *Id.* at 619-627. Her evaluation was based on review of Johnson's medical records, a clinical interview, and performance of the Wechsler Adult Intelligence Scale and a Test of Memory Malingering. *Id.* at 619.

In her description of Johnson's social history, Dr. Kalich wrote that Johnson "described a difficult childhood that was marked by trauma and disruption." *Id.* Johnson reported to Dr. Kalich that he began drinking alcohol at the age of 18 and that he spent much of his early adulthood drinking large quantities of alcohol every day. *Id.* Johnson told Dr. Kalich that after getting shot in the back, his use of alcohol increased further, as he began to mix alcohol with his prescription pain medications to help alleviate his pain symptoms. *Id.* at 621. During this period of heavy alcohol use, Johnson "incurred six DUIs and reported blacking out on one occasion." *Id.* Johnson told Dr. Kalich that over the past five to ten years, he had attempted to cut back on his alcohol consumption, though he had increased his alcohol consumption "for a short period of time" during a prior relationship due to his ex-girlfriend's lifestyle and heavy use of hard liquor. *Id.* Johnson reported that he was currently consuming somewhere between one and three beers approximately every other day. *Id.* at 101, 621. Johnson told Dr. Kalich that he had briefly experimented with marijuana in his youth. *Id.* at 622. He denied the use or experimentation with any other illegal drug, but acknowledged selling cocaine in the late 1980s. *Id.*

Dr. Kalich wrote that Johnson reported symptoms of depression and that his medical records also reflect a history of chronic irritability, depression and difficulty sleeping. *Id.*

14

Johnson told Dr. Kalich that his depression has worsened as a result of his physical limitations and chronic pain. *Id.* at 622, 629. For example, Johnson told Dr. Kalich that "Nothing's going right. I can't do things that I used to . . . it feels like something is draining my life force." *Id.* at 622. According to Dr. Kalich, the combination of his physical impairments and depression had also led Johnson to neglect self-care or hygiene, as he no longer cared about his physical appearance. *Id.* Johnson told Dr. Kalich that "several days per week" he doesn't feel like getting out of bed in the morning and experiences sleep and appetite disturbance as a result of his symptoms. *Id.* Dr. Kalich wrote that Johnson's depression came to a head in 2013 when he attempted to commit suicide by swallowing a bottle of sleeping pills before his girlfriend at the time discovered this attempt and forced him to vomit the pills out. *Id.* Johnson told Dr. Kalich that he had not thought of harming himself since he attempted suicide in 2013, but that he has "continued to wish that he was dead," often having thoughts such as "I shouldn't even be here" or "I'm here for nothing." *Id.*

Johnson described his current day-to-day functioning as "significantly impacted by his experience of chronic pain." *Id.* at 620. Johnson reported that he was residing with his girlfriend and their three children. *Id*. He reported having difficulty sleeping, and that when he is awake spends most of the day watching television or playing videogames. *Id.* Johnson told Dr. Kalich that "his energy level is that of an elderly man," and that while he attempts to help out with chores around the house such as washing the dishes, helping with his children, or cleaning the bathroom, his ability to perform these tasks is generally limited by his chronic pain. *Id.*

With respect to her behavioral observations, Dr. Kalich described Johnson as maintaining "good" eye contact, exhibiting "evenly paced and easily understood" speech, engaging in "linear" thinking. *Id.* at 623. Dr. Kalich also noted that Johnson was "soft-spoken and cooperative" but that "his mood appeared depressed, and his affect was relatively flat." *Id.* Johnson told Dr. Kalich that he was sad much of the time, though he denied a current plan or intent to harm himself or end his life. *Id.*

Dr. Kalich conducted a Wechsler Adult Intelligence Scale-IV (WAIS-IV) test to determine Johnson's cognitive ability in four global areas of functioning: verbal comprehension, perceptual reasoning, working memory, and processing speed. *Id.* at 623–24. Whereas a score of 100 is the

15

mean with a standard deviation of 15, Johnson received a verbal comprehension score of 80 or

"low average," a perceptual reasoning score of 75 or "borderline" functioning, a working memory

score of 69 or "extremely low" functioning, and processing speed score of 79 or "borderline." *Id.*

Johnson received a Full Scale score of 71, which qualified as "borderline," and fell within the 3rd

percentile of individuals in his age range. *Id.* at 624.

Dr. Kalich also performed a Test of Memory Malingering ("TOMM"), a test designed to

distinguish between individuals with a "bona fide memory impairment" and "those who are

feigning or exaggerating their symptoms." *Id.* She explained in her report that a score of less

than 25 on any trial of the TOMM "indicates the possibility of malingering," as does scoring less

than 45 on Trial two or the Retention Trial. *Id.* Conversely, "performance on Trial Two is

typically very high for non-malingerers." *Id.* Johnson scored a 48 on Trial One of the TOMM

and 50 on Trial Two. *Id.* Based on these scores, Dr. Kalich concluded that Johnson was "putting

forth optimal effort" and was not "feigning or exaggerating" his symptoms. *Id.* She also noted

that even if there were a finding of malingering as to memory (which she did not find as to

Johnson), malingering with respect to memory does not necessarily mean a claimant malingers

with respect to reporting psychological distress. *Id.*

On the basis of clinical interviews, behavioral observations, and psychological testing, Dr.

Kalich concluded that Johnson's reports of "pessimism, lack of energy, loss of interest in activities

he previously enjoyed, and sleep and appetite disturbance," Johnson's past suicidal ideation and

attempted suicide, and his "exhibition of a depressed affect," all supported a finding of depressive

disorder. *Id.* at 625. Dr. Kalich found that "Johnson's current experience of chronic pain likely

impacts his experience of major depression," in a manner such that "an increase or exacerbation in

his physical ailments often leads to an increase in his depressive symptoms." *Id.* Dr. Kalich also

noted that Johnson's history of alcohol dependence "may have exacerbated Mr. Johnson's mood

symptoms," making it "difficult to distinguish with certainty any mood symptoms that may have

occurred during the period of time when Mr. Johnson was using alcohol heavily." *Id.* She went

on to note, however, that Johnson's use of alcohol had decreased and that "despite this decreased

use, his depressive symptoms have persisted, suggesting that it is unlikely that his symptoms are

the sole product of his use." *Id.*

In addition, Dr. Kalich concluded that Johnson "meets criteria for Borderline Intellectual Functioning," and that some antisocial traits were present, though Johnson did not appear to meet the full criteria for Antisocial Personality Disorder. *Id.* With respect to Borderline Intellectual Functioning, Dr. Kalich found that Johnson's full scale IQ falls within the borderline range, and reports of special education placement, limited academic achievement, and an inability to obtain the GED all support this conclusion. *Id.* With respect to Antisocial Personality Disorder, Dr. Kalich noted that while Johnson described a history of aggression, anger issues, and criminal activity, his current antisocial traits "are less pervasive." *Id.* Dr. Kalich emphasized, however, that "it is evident that [Johnson] is vulnerable to engaging in threatening behavior when he becomes irritated or angry." *Id.*

In analyzing the impact of these mental impairments on Johnson's ability to perform work related tasks, Dr. Kalich once again emphasized the "synergistic" relationship between Johnson's chronic physical pain and depression, making it "difficult to identify the deficits in [Johnson's] daily functioning that are due solely to his psychological symptoms." *Id.* at 626. In assessing Johnson's work-related abilities, Dr. Kalich noted moderate or marked impairments in three categories. *Id.* First, Dr. Kalich found that Johnson experiences "moderate" limitations to his "activities of daily living" due to his depression, in that he "may lack the motivation and energy to engage in chores and other activities," has previously exhibited poor hygiene and self-care, and often has difficulty getting out of bed. *Id.* Second, Dr. Kalich found that Johnson has "moderate" deficits to "social functioning" as exhibited by his history of aggression and violence towards others, increased irritability due to chronic pain, and his threats towards romantic partners. *Id.* Third, Dr. Kalich described Johnson's "impairment with regard to attention and concentration," as "moderate," as indicated by his WAIS-IV results. *Id.* Dr. Kalich also found that Johnson's "irritability and depressed mood suggest that his ability to persist in a task would be "moderately to markedly impaired." *Id.* Finally, Dr. Kalich noted that Johnson has experienced depression linked with limitations in functioning that "would be consistent with an episode of decompensation," highlighting that Johnson "experienced an episode of severe decompensation in

the recent past, when he attempted suicide by overdosing." *Id.* Dr. Kalich further opined that

Johnson's emotional state is "vulnerable," that his depression may intensify over time due to his

ongoing pain, and that "problematic personality traits" may complicate his emotional symptoms.

*Id.*

#### iv. Dr. Hinman's Letter

On April 30, 2014, after the March 6, 2014 hearing before the ALJ (discussed below), Dr.

Hinman wrote a medical opinion letter reviewing the medical evaluations by Dr. Bayne and Dr.

Kalich as well as providing her own medical opinion regarding Johnson's physical and mental

impairments on the basis of her own experiences as Johnson's treating physician. *Id.* at 628-29.

As an initial matter, Dr. Hinman stated that while an MRI "could be helpful for [Johnson's]

disability case," the use of this technology is "contraindicated for individuals with shotgun

wounds" such as Johnson because the shotgun pellets "may be ferromagnetic." *Id.* at 628. From

the CT Scans and X-rays, Dr. Hinman states "we can see buckshot pellets embedded in the spine

and surrounding soft tissue at L3, L4, and L5," as well as "degenerative disc disease at these

locations." *Id.* Additionally, Dr. Hinman noted that while "[w]e cannot definitively say nerve

roots are compromised without MRI studies or surgical intervention," Johnson's "clinical findings

are consistent with nerve irritation or a lesion secondary to either a foreign body or [degenerative

disc disease]." *Id.* On this basis, Dr. Hinman agreed with Dr. Bayne's assessment of L4-L5

radiculopathy, explaining that "Dr. Bayne's examination of Mr. Johnson's lower back is consistent

with [Dr. Hinman's] observations during the past 3+ years as this patient's primary care doctor."

*Id.*

Dr. Hinman disagreed, however, with Dr. Bayne's assessment regarding Johnson's

functionality because it "appears quite conservative" and differed from the functional capacity

evaluation performed by the Contra Costa therapists, who "observed a positive SLR, decreased

sensation of the [left lower extremity], reduced [range of motion], and decreased muscle strength

of the [left lower extremity]. *Id.* Instead, Dr. Hinman agreed with the findings of the Contra

Costa therapists, which she found to differ from those of Dr. Bayne, because their opinions were

"based on actual observations of [Johnson's] functionality in a simulated work environment" and

18

were "more consistent with [her] clinical observations of Mr. Johnson during the last 3+ years." *Id.* Based on these clinical observations and her medical expertise generally, Dr. Hinman described Johnson's physical limitations as follows:

> It is reasonable to conclude that [Johnson] can lift and carry up to 15 pounds. He can likely sit for 4 to 6 hours in an 8-hour day with breaks every 30-45 minutes if necessary due to muscle spasms or cramping. He can only engage in prolonged standing and walking for brief 15 minute periods, for a total of 1-2 hours in an 8-hour day. He should limit repetitive bending, twisting, crouching, crawling, stooping, kneeling, climbing up and down stairs, inclines, ramps or ladders to rare occasions, if possible."

*Id.* at 629.

Dr. Hinman also stated that while she had primarily treated Johnson in the clinic for his "chronic pain condition," she was also concerned with his mental health prompting her referral for a psychiatric evaluation and treatment, as discussed above. *Id.* Dr. Hinman agreed with Dr. Kalich's conclusions in her psychological evaluation, finding the evaluation to be "quite thoughtful in its level of detail." *Id.* She acknowledged that the administration and interpretation of cognitive testing was outside of her training and therefore, she "defer[red] to the psychologist." *Id.* She noted, however, that she found "little reason to doubt Dr. Kalich's judgment concerning [Johnson's] work related abilities from a psychological standpoint," finding her diagnoses of moderate difficulty maintaining stability in social interactions, and moderate to marked difficulty with persistence to be reasonable in light of Johnson's chronic pain. *Id.* Dr. Hinman noted that Dr. Kalich's diagnoses regarding Johnson's depressive disorder were consistent with her own observations as well as prior diagnoses of mood disorder in Johnson. *Id.*

v. State Agency Doctors' Opinions

The Administrative Record contains opinions of a number of State Agency doctors based on their review of Johnson's medical records.

In an assessment dated March 6, 2012, Dr. Jone found that Johnson was limited to occasional (up to 1/3 of the workday) lifting and/or carrying up to 20 pounds and frequent (up to 2/3 of the workday) lifting and/or carrying of up to 10 pounds, with unlimited ability to operate hand or foot controls. *Id.* at 141. Dr. Jone also found that Johnson had the capacity to sit, stand,

and/or walk "with normal breaks" for "about 6 hours in an 8-hour workday." *Id.* With respect to Johnson's postural limitations, Dr. Jone found that Johnson could frequently climb ramps and stairs, stoop, and maintain balance, but could only occasionally climb ladders, ropes, or scaffolds, kneel, crouch, or crawl. *Id.* at 142. Dr. Jone found Johnson had no manipulative, visual, communicative, or environmental limitations. *Id.*

In an assessment dated March 2, 2012, Dr. Kravatz addressed Johnson's mental residual functional capacity. *Id.* at 143-144. Dr. Kravatz found that Johnson had some limitations to his understanding and memory, sustained concentration and persistence, and social interactions, but that he did not have adaptation limitations. *Id.* Dr. Kravatz found that Johnson was moderately limited in his ability to understand and remember detailed instructions, but not limited in his ability to remember locations and work-like procedures or to understand and remember very short and simple instructions necessary to "carry out simple and some detailed work related tasks over a 40 [hour] workweek." *Id.* at 143. With respect to concentration and persistence, Dr. Kravatz found that Johnson was moderately limited in his ability to carry out detailed instructions and work in coordination with or in proximity to others without being distracted, but that he was not significantly limited in his ability to carry out simple instructions, perform activities within a schedule and maintain regular attendance, sustain an ordinary routine without supervision, make simple work-related decisions, or complete a normal workday and workweek without interruptions from psychological symptoms. *Id.* With respect to limitations in social interactions, Dr. Kravatz found Johnson was moderately limited in his ability to interact appropriately with the general public, but had no significant limitations with respect to his abilities to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them, or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Dr. Kravatz concluded that Johnson had "some irritability" that would limit him to only occasional contacts with coworkers and the general public, but that Johnson "would relate to supervisors." *Id.* at 144.

Dr. Rudnick similarly found that Johnson had some limitations with respect to his understanding and memory, sustained concentration and persistence, and social interactions, but

that he did not have adaptation limitations. *Id.* at 159–60. With respect to understanding and memory, Dr. Rudnick agreed with Dr. Kravatz's assessment of Johnson's limitations and concluded that Johnson "is able to understand, remember, follow and perform uncomplicated three step instructions and tasks." *Id.* at 159. In the area of concentration and persistence, Dr. Rudnick agreed with Dr. Kravatz except that he also found Johnson to be moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 159–60. Dr. Rudnick found that while Johnson would have some concentration and persistence difficulties, he "can still persist, attend and maintain acceptable pace for a normal work schedule." *Id.* at 160. With respect to social interaction limitations, Dr. Rudnick found Johnson has some "irritability that would be associated with some social difficulties," but that he "remains able to accept supervision and to successfully engage in superficial work task related interpersonal interactions." *Id.*

### 3. Function Reports

On December 13, 2011, Johnson completed a Function Report in support of his current disability claim. *Id.* at 365-72. Johnson described his daily activities as getting up to take his pills and trying to help clean the house, but stated that he "can't do that [for] too long without [his] back [hurting]." *Id.* at 365. Jonson stated that the pain he experiences at night makes it difficult to fall asleep and wakes him up during the night as well. *Id.* at 366. With respect to daily chores and tasks, Johnson stated that he cannot prepare meals because he cannot stay on his feet long enough to do so, and that while he attempt to help clean the house, he cannot stay on his feet for more than 20 minutes at a time. *Id.* at 367. Johnson states that he goes outside daily, can walk, drive in a car, and ride in a car. *Id.* at 368-69. Johnson also indicated that his injuries affect his ability to lift, squat, bend, stand, walk, sit, kneel, and complete tasks, and that he can walk no more than three blocks before he needs to rest. *Id.* at 370. Johnson stated that he can pay attention "all day" but that he does not finish what he starts. *Id.* He stated that he can follow written and spoken instructions and get along with authority figures "ok." *Id.* at 370–71. Johnson stated that his ability to handle stress was "not good" and that he didn't know how well he handles changes in

routine.  *Id*. at 371.

On December 19, 2011, Johnson's girlfriend, Zanette Powell, submitted a Third Party Function Report describing her impressions of Johnson's daily routine and physical and mental limitations.  *Id*. at 336–41.  Ms. Powell described Johnson's daily routine as follows:

> [Johnson] wakes up takes medication, goes to bathroom, depending on severity of pain I assist with his shower and helping him dress. Sometimes he will fix a small meal if he doesn't have to stand long. He often has to alternate between lying down and sitting up due to pain.  Sometimes he will try to take a small walk but that [flares] his pain and leg numbness.  I cook his evening meals and assist with evening meds and helping him undress for bed.

*Id*. at 336.  She also stated that Johnson cannot work on cars, ride in cars for long distances, or walk or stand for long, and that his pain wakes him up during the night and he "constantly tosses and moans in his sleep due to pain."  *Id*. at 337.  She stated that generally Johnson could only prepare meals if they took less than two to three minutes to prepare, that he occasionally folds close or washes dishes while seated but can only perform chores two to three times a week for a half hour to an hour at a time.  *Id*. at 338.  With respect to hobbies and interests, Ms. Powell stated that Johnson watched television, played video games, and that he used to go bowling weekly but that he had to stop "due to back issues."  *Id*. at 339.  With respect to activities Johnson does with others, Ms. Powell wrote "watch sports, talk, sit outside."  *Id*. at 339.  In response to the question asking the respondent to "list the places [the claimant] goes on a regular basis, Ms. Powell wrote "he's mostly at home."  *Id*.  Ms. Powell stated that Johnson's condition affected his lifting, squatting, bending, standing, walking, sitting, kneeling and completing tasks.  *Id*. at 340.  She wrote that his lifting was limited to 20 pounds, that he couldn't squat or kneel, that he can't stand or walk long, that he has to change positions while sitting and that he has to stop tasks when pain flares or he gets numb.  *Id*.  She stated that Johnson could walk about a block or "maybe 2" before needing to rest and that he needed to rest for 10-15 minutes before he could resume walking.  *Id*.

With respect to Johnson's mental functioning, Ms. Powell described Johnson as being able to follow written and spoken instructions "very well," get along with authority figures well, and that he could pay attention "as long as needed."  *Id*. at 340-341.  However, she also noted that Johnson does not handle stress well and "gets angry when he's in pain and yells at people."  *Id*. at

340.

C. **Administrative Hearing**[8]

At the March 6, 2014 hearing, Johnson was represented by attorney Brian Hogan. On March 5, 2014, the day before the hearing, Mr. Hogan filed a brief on Johnson's behalf in which he requested that Johnson's disability onset date be amended to September 30, 2011 rather than January 1, 2003. *Id*. at 422. Mr. Hogan acknowledged that because of the prior finding of nondisability in February 2009 Johnson was required under *Chavez v. Bowen*, 844 F.2d 691 (9th Cir. 1985) to show changed circumstances to establish disability, but argued that with the amended onset date the medical record supported such a finding. *Id*. at 423.

At the hearing, the ALJ heard testimony from Johnson about recent developments relating to his impairments as well as his three attempts to return to work following the ALJ's previous finding of nondisability, summarized above in the personal background section. *See Id*. at 86-110. Johnson then offered testimony about his current symptoms and his level of functioning since the prior decision in 2009. *Id*. at 89-96. Johnson began by stating that things had gotten worse for him physically and that "[he] can't do anything [he] likes," noting that he generally is in a lot of pain but is concerned about taking too much medicine. *Id*. at 89–90. Johnson testified that the pain from the gunshot wounds in his back and in his knee has gotten worse over the years and was more constant than it used to be. *Id*. at 90–91. Johnson testified that he could stand for a maximum of 15 minutes at a time before his back started getting tight at the location of the gunshot wound and electrical "little shock[s]" started going down his legs. *Id*. at 91. He testified that while he has good days and bad days, depending on when he wakes up, he is generally in pain within 15-20 minutes after his medication wears off. *Id*. In these instances, Johnson said, he generally lays or sits down as needed to alleviate the pain. *Id*. at 92. Johnson testified that he can

---

[8] In connection with Johnson's prior disability determination by the ALJ, wherein the ALJ found Johnson to not be disabled on February 5, 2009, AR at 121–130, the ALJ held an administrative hearing on November 18, 2008. AR at 39–64. Because the ALJ found with respect to the current request for disability benefits that any presumption of ongoing disability arising out of that denial has been rebutted – and because neither parties dispute that this presumption was properly rebutted – the Court does not describe here the testimony that was offered at the November 18, 2008 administrative hearing.

1    lift no more than 15 pounds, stating that lifting and carrying are both difficult for him. *Id.*

2    Johnson testified that he could sit for only10-15 minutes at a time before his back started

3    "pulsating," requiring him to position himself differently to minimize this effect. *Id.* at 93-94.

4    Johnson also testified that bending over and squatting were painful and that he could not bend his

5    knees or squat down all the way due to arthritis in his right knee and the bullet lodged in his left

6    knee. *Id.* at 94–96.

7    　　　Regarding his mental impairments, Johnson testified that he took medication so that he

8    wouldn't "have . . . mood swings and be upset about everything" and that when he was taking

9    risperidone, it would help "mellow him out a little bit" and he wouldn't "get upset as fast." *Id.* at

10   96-97, 99. Johnson testified that he began seeing a psychiatrist at the recommendation of Dr.

11   Hinman because he was in a "lot of pain" at the time, having discovered that his 9-year old

12   daughter had been raped by her mom's live-in boyfriend, and that this incident made him "flip

13   out." *Id.* at 97-98. Johnson also testified that at times he would become irritable or get upset as a

14   result of his chronic pain, to the point where "[he] just want[ed] to be left alone," and questioned

15   the reason he was still alive. *Id.* at 98. Johnson described himself as generally depressed, which

16   takes the form of not "feel[ing] like doing anything no more," and "just try[ing] to do whatever

17   [he] can . . . to get this pain away from [him]." *Id.* at 102.

18   　　　Johnson also testified about his history of substance abuse. *Id.* at 99-101. Johnson

19   testified that he began binge drinking of alcohol when he was 18, when he would drink a big bottle

20   of E&J daily. *Id.* at 100. After getting shot, Johnson began to cut back on his alcohol

21   consumption, but he began drinking heavily once again during one of his relationships with a

22   woman who "liked to drink a lot. *Id.* at 101. Johnson testified that at the time of the hearing, he

23   was drinking less, estimating that he "might have a beer or two every other day" but that he

24   otherwise refrains from drinking. *Id.* In response to the ALJ's question regarding substance use,

25   Johnson testified that he "tried smoking marijuana" when he was younger but that it "didn't work

26   out for" him. *Id*. He testified further that he had not used "anything else." *Id*.

27   　　　Johnson next described to the ALJ a typical day in his life. According to Johnson, he goes

28   to bed by around 9:30 p.m., waking up during the night with back and leg spasms at around 1:30

a.m. *Id.* at 102. Upon waking up, Johnson tries to walk around to get rid of the spasms and pain and is up for between one and two and a half hours, at which point he "feel[s] a little better" and will "lay back down," but generally is unable to fall asleep and tosses and turns throughout the night. *Id.* at 103. During the day, Johnson feels "drained" and has "no strength to do anything." *Id.* Johnson testified that he wakes up around 8:30 or 9:00 "on a good night" and at 4:30 or 5:00 "on a bad night." *Id.* He stated that he spends a lot of the day watching TV, and that he sometimes goes outside and sits then comes back inside and watches more TV. *Id.* at 103-104. Johnson testified that he spends most of the day laying down, though he sits up and talks for "a little while" when guests like his mom or sister stop by. *Id.* at 104.

With respect to his ability to work, Johnson believes he would be unable to perform the tasks required of a mechanic or forklift operator in light of his physical condition because of the need to be able to bend over, lift objects, and climb up ladders. *Id.* at 104-05. Even for a more sedentary job involving the completion of paperwork at a desk, Johnson stated that he likely would be unable to "sit at a desk" and do paperwork all day due to the frequent tightening of his back, muscle spasms, and the inability to lay down on the job. *Id.* at 105. As an example, Johnson described the "sharp pains" in his back that he was experiencing due to sitting for about 20 to 25 minutes at the hearing. *Id.* at 106. Johnson also testified that after the Functional Capacity Evaluation in 2010, which took three hours and involved lifting and going up and down stairs, he was in a "lot of pain" and didn't want to get up the next day because he was "still in pain." *Id.*

At the conclusion of Johnson's testimony, the ALJ questioned the vocational expert ("VE"), Mary Ciddio, regarding the availability of jobs for various hypothetical claimants with limitations similar to Johnson's. *Id.* at 111–118. First, the ALJ asked the vocational expert about the availability of "lighter sedentary jobs" for "someone of Claimant's age, education, and work experience in a similar capacity for . . . non-public, simple, repetitive tasks; light exertional level; no ladder, ropes, scaffolds; other postulars are occasion[al] and that's crouch, crawl, stoop, kneel, balance, ramps and stairs," with the additional limitation that the hypothetical individual would need to "sit, stand, change . . . position every . . . 45 minutes for 10 minutes." *Id.* at 111. The VE

25

responded that such a hypothetical individual would be able to work as a "final assembler" an "inspector and hand packager" and as a "photocopy machine operator" and that all of these positions existed in significant numbers at the national level and statewide. *Id.* at 111–12. The VE testified that the tolerance for absences for these positions is one to two days a month. *Id.* at 112.

Johnson's attorney asked the VE to address a modified hypothetical RFC with the following limitations: "no public contacts and full repetitive tasks again, and we have a standing and/or walking capacity of no more than 15 minutes at a time. We would need a sit/stand option every 30 minutes with a 10 minute either walk around or getting up from a sitting position. . . . [T]he hypothetical claimant can only less than occasionally stoop; does not have the ability to kneel; can only occasionally climb stairs, ramps, and ladders in the other postural activities." *Id* The VE testified that there would no jobs that would permit a 10-minute break for every 30-minutes of sitting. *Id.* at 115. The VE testified that if that limitation were modified to sit/stand at will, the hypothetical individual could still work as a "final assembler." *Id.* at 117.

Johnson's counsel then added a non-exertional impairment to his hypothetical, asking the VE about the availability of jobs if the hypothetical individual had the same exertional limitations along with "moderate to marked impairment" in the ability to persist in the work environment. *Id.* at 118. The VE testified that for an individual who was off task up to 15% of the time, the same jobs would be available, but that 15% would be "the cutoff point." *Id.*

At the conclusion of the administrative hearing, Johnson's counsel asked the ALJ to leave the record open so that he could obtain a medical source statement from Dr. Hinman addressing Johnson's limitations and the hypothetical posed by the ALJ. *Id.* The ALJ agreed to do so and on April 20, 2014, Dr. Hinman provided the opinion letter discussed above.

### D. Legal Standard

#### 1. Presumption of Ongoing Ability to Work

A prior administrative finding of non-disability gives rise to a presumption of continuing non-disability that can only be overcome if the claimant proves "changed circumstances" indicating a more severe condition. *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir.1988) (citing

*Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985)).  Similarly, "a previous ALJ's findings concerning residual functional capacity, education, and work experience are entitled to some res judicata consideration and such findings cannot be reconsidered by a subsequent judge absent new information not presented to the first judge."  *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1173 (9th Cir. 2008) (applying *Chavez*, 844 F.2d at 694).

### 2.  5-Step Sequential Evaluation

#### a.  Five-Step Analysis

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1).  A claimant is only found disabled if his physical or mental impairments are of such severity that he is not only unable to do his previous work but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  The claimant bears the burden of proof in establishing a disability.  *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996).

The Commissioner has established a sequential five-part evaluation process to determine whether a claimant is disabled under the Social Security Act.  20 C.F.R. § 404.1520(a).  At Step One, the Commissioner considers whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(I).  If the claimant is engaged in substantial gainful activity, the Commissioner finds that the claimant is not disabled, and the evaluation stops.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two to consider whether the claimant has "a severe medically determinable physical or mental impairment," or combination of such impairments, which meets the duration requirement in 20 C.F.R. § 404.1509.  An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have a severe impairment, disability benefits are denied at this step.  If one or more impairments are severe, the

Commissioner will next perform Step Three of the analysis, comparing the medical severity of the claimant's impairments to a compiled listing of impairments that the Commissioner has found to be disabling. 20 C.F.R. § 404.1520(a)(4)(iii). If one or a combination of the claimant's impairments meet or equal a listed impairment, the claimant is found to be disabled. Otherwise, the Commissioner proceeds to Step Four and considers the claimant's RFC in light of the claimant's impairments and whether the claimant can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 404.1560(b) (defining past relevant work as "work . . . done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it"). If the claimant can still perform past relevant work, the claimant is found not to be disabled. If the claimant cannot perform past relevant work, the Commissioner proceeds to the fifth and final step of the analysis. 20 C.F.R. § 404.1520(a)(4)(v). At Step Five, the burden shifts to the Commissioner to show that the claimant, in light of his or her impairments, age, education, and work experience, can perform other jobs in the national economy. *Johnson v. Chater*, 108 F.3d 178, 180 (9th Cir. 1997). A claimant who is able to perform other jobs that are available in significant numbers in the national economy is not considered disabled, and will not receive disability benefits. 20 C.F.R. § 404.1520(f). Conversely, where there are no jobs available in significant numbers in the national economy that the claimant can perform, the claimant is found to be disabled. *Id*.

b. Mental Impairment Analysis

Where there is evidence of a mental impairment that allegedly prevents a claimant from working, the Social Security Administration has supplemented the five-step sequential evaluation process with additional regulations to assist the ALJ in determining the severity of the mental impairment, establishing a "special technique at each level in the administrative review process." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). First, the Commissioner evaluates the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has "a medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1). For each of the eleven categories contained in the adult mental disorder listings, these are described in Paragraph A. 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00.

If the claimant has a "medically determinable mental impairment," the Commissioner goes on to rate the degree of the claimant's functional limitation in the four "broad functional areas" identified in "paragraph B" and "paragraph C" of the adult mental disorders listings. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); Social Security Ruling 96-8p, 1996 WL 374184, at *4. Those four functional areas are "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). Limitations are rated on a "five point scale: None, mild, moderate, marked, and extreme." 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). Based on these limitations, the Commissioner determines whether the claimant has a severe mental impairment and whether it meets or equals a listed impairment. See 20 C.F.R. §§ 404.1520a(d)(1)-(2), 416.920(d) (1)-(2). This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above. Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.").

If the Commissioner determines that the claimant has a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, the Commissioner must assess the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3). This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential evaluation process [and] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments . . . ."  Social Security Ruling 96-8p, 1996 WL 374184, at *4.

### 3.  ALJ Analysis and Findings of Fact

As a preliminary matter, the ALJ found that the presumption of non-disability under *Chavez* that arose as a result of the prior denial of disability, on February 9, 2009, had been rebutted because Johnson had "additional 'severe' impairments and a reduced residual functional capacity, since the prior decision.  AR at 22.  Therefore, the ALJ proceeded to the 5-step analysis.

At Step 1 of the sequential analysis, the ALJ held that "[t]here is no evidence of substantial

29

gainful activity since September 30, 2011, the amended application date."  AR at 25.

At Step 2, the ALJ held that Johnson had the following severe impairments within the meaning of the Social Security regulations:

> Lumbar degenerative disc disease; residuals of gunshot wound; right knee osteoarthritis; depressive disorder; borderline intellectual functioning; antisocial traits; [and] alcohol abuse in partial remission.

AR at 25 (referencing 20 C.F.R. § 416.920(c)).  The ALJ also found "that alcohol abuse in partial remission continues to more than minimally affect [Johnson's] ability to do work-related tasks." AR at 25.

At Step 3, the ALJ concluded that Johnson "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1."  *Id.* (citing 20 C.F.R. §§ 416.920(d), 416.925, 416.926). As part of his analysis, the ALJ evaluated Johnson's impairments "within the context of Listings 1.02, 1.04, 12.04, 12.05, 12.08, and 12.09."  AR at 25.

With respect to Listing 1.02 for major dysfunction of a joint or joints, the ALJ found that the criteria of this listing were not met because "the evidence fails to establish an inability to ambulate effectively" as required for knee impairments.  *Id.*  The ALJ further found that the criteria of Listing 1.04A, for "disorders of the spine" with "evidence of nerve root compression" were not met "because . . . there is no documentation of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss, and positive straight-leg raising test."  *Id.*

For the remaining Listings (12.04, 12.05, 12.08 and 12.09), which relate to mental impairments, the ALJ found that the severity of Johnson's impairments, singly and in combination, did not meet or exceed the statutory criteria.  *Id.*  The ALJ noted that "Paragraph B" criteria for Listings 12.04, 12.08, and 12.09, as well as the "Paragraph D" criteria for Listing 12.05,[9] require that a claimant's "mental impairments must result in at least two of the following:

---

[9] At the time of the ALJ's decision, Listing 12.05 included paragraphs B through D, with paragraph D of 12.05 being the same as Paragraph B for all other mental impairment listings.

marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." *Id.* The ALJ found that Johnson "has a moderate restriction of activities of daily living and social functioning" and "moderate" difficulties with concentration, persistence, or pace. *Id.* at 25-26. He found no episodes of decompensation of an extended duration documented in the record. *Id.* at 26. The ALJ noted that while Dr. Kalich mentioned a prior suicide attempt as one episode of decompensation and opined that Johnson's depression "would be consistent with an episode of decompensation," she did not "clearly set forth any episodes of decompensation of extended duration." *Id.* Because he found that Johnson's impairments did not cause at least two marked limitations or one marked limitation and "repeated" episodes of decompensation, each of extended duration, the ALJ concluded the "Paragraph B" criteria for Listings 12.04, 12.08, and 12.09 and "Paragraph D" criteria for Listing 12.05 were not satisfied. *Id.* The ALJ also found there to be no evidence establishing the presence of "Paragraph C" criteria. *Id.*

For Listing 12.05, the ALJ noted that Paragraph A requirements are satisfied only when "there is mental incapacity evidence by dependence upon others for personal needs . . .and inability to follow directions, such as the use of standardized measures of intellectual functioning is precluded." *Id.* He found that requirement clearly was not met because Dr. Kalich was able to administer standardized tests to Johnson. *Id.* He further found that the Paragraph B criteria were not met as to Listing 12.05 because Paragraph B requires a valid verbal, performance, or full scale IQ of 59 or less, and "Dr. Kalich's testing revealed a full scale IQ of 71; verbal comprehension index of 80; perceptual/reasoning index of 75; working memory of 69; and processing speed index of 79." *Id.* Additionally, the ALJ found that the "Paragraph C" criteria for Listing 12.05 were not met because Johnson "does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.*

At Step 4, the ALJ found that Johnson had the RFC to perform a limited range of light work as defined in 20 C.F.R. § 416.967(b) with the following limitations:

31

He can perform nonpublic, simple repetitive tasks; is limited to lifting/carrying no more than 15 lbs.; must be allowed to alternate sitting and standing at will; can perform no work on ladders, ropes, or scaffolds; and can occasionally crouch, crawl, stoop, balance, kneel, and climb ramps and stairs.

*Id.* at 27. The ALJ began his Step 4 analysis by summarizing Johnsons medical records. *Id.* at 27–29. Following his summary of these records, and "[a]fter careful consideration of the evidence," the ALJ found "that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms" but that Johnson's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. . . ." *Id.* at 30.

First, the ALJ noted that "although he has extensive complaints, Mr. Johnson has received relatively little medical treatment over the past five years." *Id.* The ALJ emphasized that he was also "impressed by what [Johnson] can do," including driving and helping care for three of his children, helping a nephew learn auto mechanics, and pushing/pulling 59 to 75 pounds for a distances of 50 feet during testing. *Id.* The ALJ also noted that when Johnson's legs and back went out in 2010 he was helping a friend fix a transmission. *Id.* Given that Johnson initially alleged an onset date of January 1, 2003, this meant the injury occurred during a time when Johnson alleged he was disabled. *Id.* With respect to Johnson's alleged mental impairments, the ALJ characterized the relevant psychological reports as "mostly about anger and poor personal relationships, which themselves do not preclude work." *Id.* The ALJ also emphasized that Johnson has "continued to drink alcohol despite a history of abuse." *Id.* The ALJ concluded based on this evidence that that "[t]he claimant's activities show a greater physical and mental capacity than he has alleged." *Id.*

The ALJ also found that "all [the opinion evidence] gravitates toward the residual functional capacity set forth herein." *Id.* In coming to this conclusion, the ALJ described Dr. Kalich's assessment as "quite nuanced," going "only slightly further [than the ALJ's residual functional capacity] in opining moderate to marked limitations in persistence." *Id.* The ALJ found that with respect to "all other areas of functioning," Dr. Kalich "couched" her assessment "in terms of 'might' and 'may.'" *Id.* The ALJ also "decline[d] to accord [Dr. Hinman's] opinions

controlling weight" because her "comments on the reports of Drs. Bayne and Kalich essentially amount to advocacy for her patient rather than impartial analysis." *Id.*

Finally, the ALJ found at Step 4 that the only past relevant work Johnson had performed since his prior disability application was denied in 2009 was as an auto mechanic, and that Johnson was unable to perform this work due to the medium level of exertion required for that job and Johnson's RFC limiting him to light exertion jobs. *Id.* at 31.

At Step 5, the ALJ concluded that Johnson was "not disabled" because there was a significant number of jobs available to individuals of Johnson's RFC, age, education, and work experience in the national economy and in California. *Id.* at 31-32. Using the Medical-Vocational Guidelines as a framework, and based on the testimony of the vocational expert, the ALJ concluded that Johnson could work as a "Final Assembler and as an "Inspector/Hand Packager" and that these jobs existed in significant number in the national and California economy. *Id.* at 31–32. Based on this five-step analysis, the ALJ determined that Johnson was not disabled from the date of his application and alleged disability onset date of September 30, 2011 through the date of the ALJ's decision. AR at 32-33.

### E. Contentions of the Parties on Summary Judgment

#### 1. Johnson's Motion for Summary Judgment

In his Motion for Summary Judgment ("Johnson Motion"), Johnson contends the Commissioner erred in finding that he was not disabled by rejecting the opinions of treating physician Dr. Hinman and examining psychologist Dr. Kalich without setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record. Motion at 1. As to Dr. Hinman, Johnson concedes that her opinions as to his limitations are contradicted by Dr. Bayne's opinions and therefore that only "specific and legitimate" (rather than "clear and convincing") reasons must be given for rejecting her opinions. *Id.* at 9. According to Johnson, the ALJ failed to meet that standard, however, when he dismissed Dr. Hinman's opinions on the basis that they "essentially[ed] amount to advocacy for her patient rather than impartial analysis.'" *Id.* (quoting AR at 30). Johnson contends this is not a legitimate reason to dismiss Dr. Hinman's opinions where, as here, there is no evidence of misconduct on the part of the physician and her

33

opinion is supported by medical evidence. *Id.* (citing *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995)). Johnson notes that "[i]n her report, Dr. Hinman clearly states that she is basing her opinion on her 'medical expertise and clinical time with Mr. Johnson,'" as well as "findings made during an occupational therapy evaluation," and "the opinion of a forensic psychologist. *Id.* at 9-10 (citing AR at 629-30).

Similarly, Johnson contends the ALJ erred by failing to offer specific, legitimate reasons for rejecting Dr. Kalich's opinion that Johnson had "moderate to marked limitations in persistence." *Id.* at 10.

Johnson argues that the record was fully developed and that if the improperly rejected opinions were credited as true, the Commissioner would be required to find him disabled on remand. Therefore, he asserts, the Court should reverse the ALJ's finding and remand for award of benefits. *Id.*

### 2. The Commissioner's Motion and Opposition

In response to Johnson's Motion, the Commissioner filed a Motion for Summary Judgment and Opposition to Johnson's Motion ("SSA Motion"), contending that the ALJ "properly evaluated the medical opinion evidence," and therefore, that "[t]he Court should affirm the ALJ's decision." SSA Motion at 4, 9. Disputing Johnson's assertion that the ALJ improperly rejected the medical opinions of treating physician, Dr. Hinman, and examining psychologist, Dr. Kalich, the Commissioner contends that "the ALJ considered the various opinions of Plaintiff's functioning, both mental and physical, and concluded that 'it all gravitates toward the residual functional capacity set forth herein.'" *Id.* at 4 (quoting AR at 30).

With respect to Dr. Hinman's opinions, the Commissioner contends that "Dr. Hinman opined roughly the same level of limitations" as those adopted by the ALJ, and at the very least "the ALJ's translation of Dr. Hinman's opinion is certainly a rational interpretation of that opinion." *Id.* at 5. In particular, according to the Commissioner, Dr. Hinman found that Johnson was limited to "lifting no more than 15 pounds, standing and walking one to two hours per day for 15 minutes at a time, sitting for four to six hours per day for 30-45 minute periods, and should avoid more than rare repetitive bending, twisting, crouching, crawling, stooping, kneeling, and

climbing 'if possible'" whereas "[t]he ALJ found that Plaintiff could lift and carry up to 15 pounds; needed the option to sit or stand at will; could occasionally climb, balance, stoop, crouch, kneel, and crawl; and never climb ropes, ladders or scaffolds." *Id.* (citing AR at 27, 629). In fact, the Commissioner contends, the ALJ's adopted limitation "allowing a sit-stand option was more flexible than Dr. Hinman's opinion that Plaintiff could sit for 30–45 minutes at a time and stand or walk 15 minutes at a time, and certainly accommodated Dr. Hinman's opinion." *Id.*

In support of its contention that the ALJ's RFC was supported by substantial evidence, the Commissioner points to the opinions of three medical sources "upon which the ALJ could have relied instead of Dr. Hinman's opinion," all of which found that Johnson's limitations were less severe than the ALJ and Dr. Hinman found. *Id.* (citing the opinions of state agency physicians Dr. Jone and Dr. Hanna, who concluded "that Plaintiff could lift up to 20 pounds, stand and walk six hours per day, and frequently balance and stoop," and Dr. Bayne, who "opined that Plaintiff could life up to 40 pounds, stand and walk four hours per day, and perform repetitive postural activities occasionally") (citing AR at 141-42, 155-56, 543). Instead, the Commissioner contends, "the ALJ chose to rely on Dr. Hinman's opinion." *Id.*

The Commissioner argues further that the ALJ's restrictions as to Johnson's ability to the bend, twist, crouch, crawl, stoop, kneel, and climb up and down stairs, inclines, ramps, or ladders are "a reasonable reading of Dr. Hinman's letter." *Id.* at 5-6. Dr. Hinman opined that Johnson "should limit repetitive bending, twisting, crouching, crawling, stooping, kneeling, climbing up and down stairs, inclines, ramps, or ladders to rare occasions, if possible." *Id.* at 5 (quoting AR at 629). According to the Commissioner, the ALJ found that Johnson could perform "most of these activities occasionally, but could never climb ladders." *Id.* at 5-6 (quoting AR at 27). The Commissioner argues that this reading of Dr. Hinman's opinion is reasonable because "repetitive" activities occur more than "frequent" activities, "which require between one third and two-thirds of the work day," whereas "occasional" is defined as "very little up to one-third of the time." *Id.* at 6 (citing Social Security Ruling ("SSR") SSR 83-10 (defining occasional and frequent); SSR 96-9p (defining occasional); *Stark v. Astrue*, 462 Fed. App'x 756 (9th Cir. 2011) (finding that repetitive activities occur more often than frequent activities).

The Commissioner also notes that "to the extent Dr. Hinman indicated that Plaintiff should limit *all* bending, twisting, etc. to rare occasions . . . Dr. Hinman opined that Plaintiff should perform such activities rarely 'if possible.'" *Id.* at 6 (quoting AR at 629). According to the Commissioner, this usage of "if possible" language regarding these limitations is not equivalent to a prohibition of those activities if the job requires them to be performed. *Id.* at 6 (citing 20 C.F.R. § 416.945(a)(1) for the proposition that "[a]n individual's RFC does not conform to a claimant's ideal job, but rather the most he can do despite his limitations").

With respect to Johnson's mental limitations, the Commissioner argues that the ALJ properly incorporated Dr. Kalich's opinions into his RFC, agreeing "in large part with her conclusions that Plaintiff would have moderate limitations in activities of daily living, maintaining social functioning, and maintaining concentration persistence, or pace," while not agreeing with Dr. Kalich's claims regarding episodes of decompensation because "she did not explain or support this claim." *Id.* at 7 (citing AR at 26, 626). In "disagreeing with Dr. Kalich on that one point," but "otherwise accepting her opinion," the Commissioner contends the ALJ did not err in his evaluation of Dr. Kalich's opinion. *Id.* (citing *Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989)).

The Commissioner rejects Johnson's argument that the ALJ did not accept Dr. Kalich's finding of "moderate to marked limitations in persistence because of depression and irritability," arguing that "the ALJ considered Plaintiff's various limitations, including limitations in persistence and limitations caused by depression and irritability, and incorporated the only concrete restrictions available to him—State agency psychologist Dr. Kravatz and psychiatrist Dr. Rudnick's opinions that Plaintiff could perform simple tasks with limited public contact." *Id.* (citing AR at 143-44, 159-60). In this manner, the Commissioner claims "the ALJ appropriately accommodated Dr. Kalich's opinion of limitations." *Id.* (citing *Stubbs-Danielson*, 539 F.3d 1169, 1174 (9th Cir. 2008)).

The Commissioner contends Johnson is incorrect in pointing to the ALJ's statement that Dr. Hinman's opinions were "advocacy" as evidence that the ALJ improperly rejected Dr. Hinman's comments about the reports of Dr. Kalich and Dr. Bayne. *Id.* at 8. In fact, the

Commissioner asserts, "[t]he ALJ merely stated that he was not giving controlling weight to Dr. Hinman's conclusions," which is the correct approach when the opinion of a treating source is contradicted by other substantial evidence. *Id.* (citing 20 C.F.R. § 416.927(c)(2)). The Commissioner goes on to argue that "[e]ven if Dr. Hinman assessed a more limited RFC than the ALJ found . . . the ALJ's reference to advocacy by Dr. Hinman for her patient (Plaintiff) provides a sufficient basis for disagreeing with Dr. Hinman" because "an ALJ can reject a treating source opinion written in an effort to aid the claimant in receiving disability benefits, particularly where the record does not support the opinion," which the Commissioner contends is the case here. *Id.* (citing *Saelee v. Chater*, 94 F.3d 520, 522-23 (9th Cir. 1996)).

In summary, the Commissioner contends that "the ALJ did not reject Dr. Kalich's opinion or Dr. Hinman's letter." *Id.* at 9. Instead, "the ALJ gave significant weight to these opinions, and translated them into specific functional limitations and restrictions in the RFC." *Id.* Because the opinions do not support a finding of disability, the Commissioner argues, the Court should defer to the ALJ's choice among different rational interpretations. *Id.* (citing *Burch v. Barnhart*, 400 F.3d 676, 680-81(9th Cir. 2005)). The Commissioner argues further that even if the Court were to find that the ALJ erred, it should remand for further proceedings rather than for an award of benefits because the credit-as-true rule is inapplicable in this case. *Id.* at 10. In particular, the Commissioner asserts,"[h]ere, the record creates serious doubt as to whether Plaintiff was disabled," given that "[m]ultiple medical sources opined that Plaintiff was more capable than the ALJ found." *Id.* In addition, it contends, the opinions of Dr. Hinman and Dr. Kalich, even if credited as true, do not translate to disability and therefore the ALJ would need to obtain vocational testimony to explore the effect of those opinion on Johnson's ability to work. *Id.*

### 3. Johnson's Reply

In his Reply brief, Johnson describes the Commissioner's arguments as "post-hoc rationalizations defending the ALJ's decision," and reiterates his position that "the ALJ did indeed reject the opinions of both Dr. Hinman and Dr. Kalich and erred in doing so." Reply at 1.

With respect to the opinions of Dr. Kalich, Johnson claims that the Commissioner improperly relies upon *Stubbs-Danielson* for the proposition that "an ALJ does not reject an

37

examining source opinion regarding limitations in persistence if the ALJ translates that limitation into the only concrete restriction available to him." *Id.* (citing *Stubbs-Danielson,* 539 F.3d at 1174). While Johnson acknowledges that this proposition is correct as a general matter, he contends that the ALJ actually did "specifically reject the limitation in question and implied that Dr. Kalich's opinion is not consistent with his RFC" by stating that her opinion goes "slightly further" than his own RFC in opining moderate to marked limitations in persistence. *Id.* (quoting AR at 30). Johnson contends that "it is this difference (that 'slightly further') that the ALJ rejected and explicitly did not incorporate into a 'concrete restriction'" to satisfy the standard articulated in *Stubbs-Danielson. Id.* Johnson argues that the ALJ erred in rejecting Dr. Kalich's assessment of moderate to marked limitations in persistence "without offering specific, legitimate reasons for doing so," and that this error was not harmless in light of the Vocational Expert's testimony indicating that "such a restriction may preclude all work activity." *Id.* (citing AR at 118).

Johnson also contends the Commissioner's characterization of the ALJ's opinion as incorporating rather than rejecting the opinions of Dr. Hinman is inaccurate, pointing to "important differences between Dr. Hinman's medical source statement regarding [Johnson's] functional capabilities and the ALJ's RFC." *Id.* at 2. First, Dr. Kalich opined that Johnson would have moderate to marked impairment persisting in tasks and Dr. Hinman agreed with that opinion, yet the ALJ did not incorporate that limitation in his RFC and did not provide specific, legitimate reasons for rejecting this opinion, Johnson contends. *Id.* Second, "the ALJ's RFC includes the limitation that the Plaintiff 'must be allowed to alternate sitting and standing at will,'" which was interpreted by the Vocational Expert to mean "sitting and standing is 30 minutes at a time," but neither of these formulations is consistent with Dr. Hinman's opinion limiting Johnson's "sitting capacity to 4 to 6 hours in an 8-hour day with breaks every 30 to 45 minutes if necessary due to muscle spasms or cramping, and his standing capacity to a total of 1 to 2 hour in an 8-hour day in brief 15 minute periods." *Id.* (citing AR 27, 114-15, 629). According to Johnson, "Dr. Hinman's restrictions paint a picture of a man who may only be able to engage in exertional work activity within the range of 5 to 8 total hours out of an 8-hour workday depending

38

on his muscle spasms or cramping." *Id.* Johnson argues that the ALJ did not take into account these restrictions in coming to his RFC and thus rejected them. *Id.* Further, to the extent these limitations suggest Johnson cannot work a full 8-hour day, Johnson contends he would have been found disabled if these limitations had been included in his RFC. *Id.*

Finally, Johnson rejects the Commissioner's position that the ALJ gave "specific and legitimate reasons" for rejecting Dr. Hinman's opinions when he found that her report amounted to advocacy rather than an impartial analysis. *Id.*at 2-3. In particular, Johnson contends the Commissioner's reliance upon *Saelee v. Chater*, 94 F.3d 520 (9th Cir. 1996) is misplaced because in that case, the court held that a physician's advocacy may be a reason to reject an opinion only where there is evidence of improper conduct or there is no medical basis for the opinion – neither of which is true here. *Id.* at 3 (citing *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995) (quoting *Ratto v. Secretary*, 839 F. Supp. 1415, 1426 (D.Or.1993) ("The Secretary may not assume that doctors routinely lie in order to help their patients collect disability benefits.")).

For these reasons, Johnson argues the Court should reverse the decision of the Commissioner finding that Johnson is not disabled and remand for an award of benefits.

## III.    ANALYSIS

### A.    General Legal Standard Under 42 U.S.C. § 405(g)

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner that are free from legal error and supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be based on the record as a whole. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence means "more than a mere scintilla," *id*., but "less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs*., 846 F.2d 573, 576 (9th Cir. 1988). Even if the Commissioner's findings are supported by substantial evidence, these findings should be set aside if proper legal standards were not applied when weighing the evidence and in reaching a decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).

In reviewing the record, the Court must consider both the evidence that supports and

detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)). If the evidence is "susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The Court is additionally "constrained to review the reasons the ALJ asserts" and "cannot rely on independent findings" to affirm the ALJ's decision. *Connett v. Barnhart*, 340 F.3d 871, 874 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

## B. Evaluation of Medical Opinions

### 1. Legal Standards

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."[10] *Lester v. Chater*, 81 F.3d at 830. "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted).

The Ninth Circuit has recently emphasized the high standard required for an ALJ to reject an opinion from a treating or examining doctor, even where the record includes a contradictory medical opinion:

> "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the

---

[10] Psychologists' opinions are subject to the same standards as physicians' opinions. *See* 20 C.F.R. § 404.1527(a)(2); *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (applying standards discussing physicians' opinions to evaluate an ALJ's treatment of a psychologist's opinion).

facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)]. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion. *See id.*

*Garrison*, 759 F.3d at 1012-13 (quotation marks, citations, and footnote omitted).

In analyzing whether to accept or reject the opinions of treating and examining physician in light of conflicting medical evidence, a "nonexamining medical advisor's testimony does not by itself constitute substantial evidence that warrants a rejection of either the treating doctor's or the examining psychologist's opinion." *Lester*, 81 F.3d at 832. Further, "[t]he purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them." *Id.* Without evidence of "'actual improprieties,'" the Secretary may "'not assume that doctors routinely lie in order to help their patients collect disability benefits.'" *Id.* (quoting *Ratto v. Secretary*, 839 F. Supp. 1415, 1426 (D. Or. 1993)).

### 2. Whether the ALJ Properly Evaluated the Opinions of Dr. Hinman and Dr. Kalich

In determining whether the ALJ erred in his evaluation of Dr. Hinman and Dr. Kalich's opinions, the Court must determine, as a preliminary matter, whether the ALJ rejected their opinions or instead, incorporated them into his RFC. If he rejected the opinions of these doctors, the Court must decide whether the ALJ offered adequate reasons for doing so. Johnson highlights two aspects of Dr. Hinman and Dr. Kalich's opinions in arguing that the ALJ failed to give them sufficient weight: 1) his limitations as to sitting and standing; and 2) his limitation as to persistence.[11] The Court concludes that as to both of these limitations, the ALJ's RFC is

---

[11] The Commissioner argued in the cross-motion for summary judgment that the RFC is consistent with Dr. Hinman's opinions as to Johnson's postural limitations, pointing to the applicable definitions of "occasional" and "repetitive." Johnson does not challenge this argument in his

1    inconsistent with the opinions of Dr. Hinman and Dr. Kalich and that the ALJ failed to articulate

2    adequate reasons for finding that Johnson's functional abilities were greater than those opined by

3    these physicians.

4           a.    Sitting/Standing Limitations

5           With respect to sitting/standing limitations, Dr. Hinman opined that Johnson "can likely sit

6    for 4 to 6 hours in an 8-hour day with breaks every 30-45 minutes if necessary due to muscle

7    spasms or cramping.  He can only engage in prolonged standing and walking for brief 15 minute

8    periods, for a total of 1-2 hours in an 8-hour day."  AR at 629.  Although the ALJ's RFC includes

9    a requirement that Johnson must be allowed to "alternate sitting and standing at will," it contains

10   no limitation as to the amount of time in an 8-hour day Johnson can spend either sitting or

11   standing;  nor does it include any limitation that reflects Dr. Hinman's opinion (which is at least

12   implied) that Johnson may not always be able to work a full 8-hour day due to muscle spasms or

13   cramping.  Rather, the ALJ clearly rejected this aspect of Dr. Hinman's opinion when he stated

14   that he declined to "accord her opinions controlling weight" because her "comments on the

15   report[] of [Dr.] Bayne  . . . essentially amount[s] to advocacy for her patient rather than impartial

16   analysis."  AR at 30.  Therefore, the Court finds unpersuasive the Commissioner's assertion that

17   the ALJ's RFC reasonably incorporated Dr. Hinman's opinions as to Johnson's sitting and

18   standing abilities.

19          Because the ALJ rejected this aspect of Dr. Hinman's opinion, he was required to articulate

20   adequate reasons for doing so.  As Dr. Hinman's opinion was contradicted by the opinion of Dr.

21   Bayne with respect to Johnson's sitting and standing abilities, the ALJ was required to provide

22   specific and legitimate reasons for rejecting her opinion. *Garrison*, 759 F.3d at 1012-13.  He did

23   not do so.   His conclusory statement that Dr. Hinman's opinion is mere advocacy (which is the

24   only reason he gives for rejecting Dr. Hinman's opinion) does not comport with the Ninth Circuit

25   case law.  Although the Commissioner argues that the ALJ's reason was adequate under *Saelee v.*

26   *Chater*, that case is entirely distinguishable.  There, the court found the ALJ had properly rejected

27

28   Reply brief and therefore, the Court concludes that he has implicitly conceded that in this respect,
     the ALJ's RFC is based on a reasonable interpretation of Dr. Hinman's opinion.

the opinion of a treating physician as "untrustworthy" because the opinion "was obtained solely for the purposes of the administrative hearing, varied from [the physician's] own treatment notes, and was worded ambiguously in an apparent attempt to assist [the claimant] in obtaining social security benefits." 94 F.3d at 522. The ALJ further explained that the ambiguous wording of the doctor's opinion reflected "an effort by the physician to assist a patient even though there is no objective medical basis for the opinion."

In contrast to the facts of *Saelee v. Chater*, Dr. Hinman articulated an objective medical basis for her opinion as to Johnson's sit/stand limitations, namely, her "clinical observations of Mr. Johnson during the last 3+ years." AR at 629. The record also reflects her extensive treatment relationship with Johnson, which included referrals for various evaluations and tests. In addition, Dr. Hinman specifically addressed her reason for concluding that Dr. Bayne's assessment of Johnson's limitations was overly "conservative," pointing to the findings of the Contra Costa therapists in 2010, which, in contrast to the opinions of Dr. Bayne, were based on "actual observations of [Johnson's] functionality in a simulated work environment." *Id.* Given that Dr. Hinman's opinions were supported by her own treatment relationship and specific findings by the Contra Costa therapists, and in the absence of any evidence of wrongdoing on Dr. Hinman's part, it was impermissible for the ALJ to dismiss her opinions as to the sit/stand limitation solely on the basis that Dr. Hinman was engaging in "advocacy." *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996) (holding that the ALJ had improperly reject the opinion of an examining physician on the basis that that the claimant's attorney had referred him to the physician for evaluation where there was no evidence of any impropriety on the part of the physician and the physician had provided a "thorough report" that was "based on an examination, a battery of tests, and review of the claimant's hearing testimony").

The Court also rejects the Commissioner's suggestion that the opinions of Dr. Bayne, Dr. Jone, and Dr. Hanna "constituted substantial evidence upon which the ALJ could have relied instead of Dr. Hinman's opinion." Neither Dr. Hanna nor Dr. Jone examined Johnson and therefore, their opinions as to Johnson's limitations do not constitute substantial evidence that warrants a rejection of Dr. Hinman's opinion as to Johnson's sit/stand limitations. *Lester*, 81 F.3d

43

at 832. Thus, the only evidence that *might* constitute substantial evidence that supports the ALJ's RFC as to Johnson's sit/stand limitations would be Dr. Bayne's. In the absence of any legitimate explanation by the ALJ as to why Dr. Bayne's opinions should be given more weight than Dr. Hinman's opinions, however, the Court cannot not find that the ALJ's RFC is supported by substantial evidence as to this limitation.

### b. Persistence Limitation

It is also clear that the ALJ rejected the opinions of Dr. Hinman and Dr. Kalich as to Johnson's ability to persist in a work setting. While "an ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony," *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008), in this case the ALJ did not attempt to translate this restriction into concrete limitations related to the work setting. Instead, he rejected all of Dr. Hinman's opinions as advocacy and explicitly acknowledged that Dr. Kalich's opinion as to this limitation, went "slightly further [than his RFC] in opining moderate to marked limitations in persistence." AR at 30. Thus, the Commissioner's assertion that the RFC is a reasonable interpretation of Dr. Hinman's and Dr. Kalich's opinion as to this limitation has no merit.

The opinions of Drs. Hinman and Kalich are contradicted by the opinions of two state agency physicians who performed a record review, Drs. Kravatz and Rudnick.[12] Therefore, the ALJ was required to offer specific and legitimate reasons for rejecting the opinions of Drs. Hinman and Kalich as to Johnson's limitations with respect to his ability to persist in the workplace. As discussed above, the single reason provided by the ALJ for rejecting Dr. Hinman's opinions – that she was engaged in "advocacy" – is not a legitimate reason on this record. As to Dr. Kalich's opinion, the ALJ offers no specific or legitimate reasons for rejecting her opinion that

---

[12] As noted above, Dr. Kravatz found that Johnson was moderately limited in his ability to carry out detailed instructions and work in coordination with or in proximity to others without being distracted, but that he was not significantly limited in his ability to carry out simple instructions, perform activities within a schedule and maintain regular attendance, sustain an ordinary routine without supervision, make simple work-related decisions, or complete a normal workday and workweek without interruptions from psychological symptoms. AR at 143. Dr. Rudnick found that Johnson was moderately limited as to his ability to complete a normal work day and work week." AR at 160.

44

Johnson's ability to persist in a work setting would be moderate to marked and indeed, he concedes that Dr. Kalich's opinion is "quite nuanced." The ALJ states that "in all *other areas of functioning*, [Dr. Kalich's] opinion is couched in terms of 'might' and 'may,'" AR at 30 (emphasis added), but he does not rely on such language as a basis for rejecting Dr. Kalich's opinion with respect to persistence. Further, his general statement that all of the medical opinion evidence "gravitates toward the residual functional capacity set forth herein," is not a specific reason for apparently crediting the opinions of the state agency doctors (who did not examine Johnson) over the opinions of Dr. Kalich (who examined Johnson) and Dr. Hinman (who treated Johnson for more than three years). Moreover, as discussed above, a "nonexamining medical advisor's testimony does not by itself constitute substantial evidence that warrants a rejection of either the treating doctor's or the examining psychologist's opinion." *Lester*, 81 F.3d at 832.

Further, the ALJ's statement that "the psychological reports are mostly about anger and poor personal relationships, which themselves do not preclude work," AR at 30, suggests that the ALJ may have relied on an *illegitimate* reason for rejecting the opinions of Drs. Kalich and Hinman as to Johnson's ability to persist in a work setting. As discussed above, the record reflects that Johnson's treating physicians, including Dr. Hinman and Dr. Shapiro, treated him for depression and a possible mood disorder, a primary symptom of which was irritability and anger. Dr. Shapiro prescribed Risperdal to address this symptom. *See, e.g.*, AR at 573. Dr. Kalich's opinion as to Johnson's moderate to marked limitation in persistence was based on Johnson's depression and irritability. In this context, the ALJ's suggestion that Johnson's "anger" could not give rise to disability is inconsistent with the standards for evaluating a claimant's mental residual functional capacity discussed above and appears to be based on the ALJ's own personal opinion rather than any medical evidence in the record.

Accordingly, the Court finds that the ALJ erred in rejecting the opinion of Dr. Hinman as to sitting and standing limitations and the opinions of both Dr. Hinman and Dr. Kalich as to persistence limitations without offering specific and legitimate reasons for doing so. The Court further finds that the ALJ's RFC is not supported by substantial evidence to the extent that it fails to adequately reflect these opinions.

**C.     Whether the Case Should be Remanded for Further Proceedings or for Award of Benefits**

"Usually, '[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded.'" *Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014) (quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)).  In "appropriate circumstances," however, "courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits" to avoid unnecessary delay in the receipt of benefits.  *Id.* (citations omitted).  Under this "credit-as-true standard," a district court must credit that evidence as true and remand for an award of benefits, rather than remanding for further proceedings, where the following conditions are met:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Id.* at 1019-20.

Here, the ALJ failed to provide legally sufficient reasons for rejecting the opinions of Drs. Hinman and Kalich, as discussed above.  It is not clear that the other two requirements of the credit-as-true standard are satisfied, however.  First, with respect to whether "the record has been fully developed and further administrative proceedings would serve no useful purpose," the Court finds that further administrative proceedings would be useful.  Additional administrative proceedings would allow for clarification regarding the scope of Johnson's limitations, both as to his ability to sit and stand and as to persistence.  Further, at the hearing the VE did not address hypotheticals that incorporated the limitations reflected in the opinions of Drs. Hinman and Kalich.  Consequently, to the extent those opinions are credited, further vocational testimony will be helpful to determine whether Johnson is disabled.  For the same reason, the Court concludes that the third requirement of the credit-as-true standard is not met.

Therefore, the Court finds that remanding for further administrative proceedings rather than for an award of benefits is appropriate in this case.

**IV.    CONCLUSION**

Plaintiff's Motion for Summary Judgment is GRANTED.  Defendant's Motion for Summary Judgment is DENIED.  The case is remanded to the Commissioner for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated:  August 24, 2017

JOSEPH C. SPERO
Chief Magistrate Judge